IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FISHBOWL PRIZES, INC. and DEAN RAGE DEVELOPMENT, LLC., | ) ) ) |
|      Plaintiffs, | ) ) |
| V. | ) ) |
| BOLD LABS, INC., and DOMAIN.COM, LLC., | ) ) |
|      Defendants. | ) |

## COMPLAINT FOR INJUNCTION AND OTHER RELIEF

Plaintiffs Fishbowl Prizes, Inc. ("Fishbowl Prizes") and Dean Rage Development, LLC ("Dean Rage"), for their Complaint for Injunction and Other Relief against Bold Labs, Inc. ("Bold") and Domain.com, LLC ("Domain"), state as follows:

## PARTIES AND JURISDICTION

1. Plaintiff Fishbowl Prizes is a corporation organized under the laws of the State of Illinois with its principal place of business located at 325 Briar Lane, Highland Park, Illinois.

2. Dean Rage is a limited liability company organized under the laws of the State of Illinois with its principal place of business located at 325 Briar Lane, Highland Park, Illinois. The members of Dean Rage are Dean Zelinsky ("Zelinsky"), a resident of Highland Park, Illinois and Rage Communications Private Limited ("Rage"), a corporation organized under the laws of the country of India with its principal place of business located in India.

3. Defendant Bold is, on information and belief, a corporation organized under the laws of the country of Canada with its principal place of business located at 50 Fultz Blvd., Winnipeg, Canada.

4.    Defendant Domain is a limited liability company organized under the laws of the State of Washington with its principal place of business located at 13115 NE 4th Street, Vancouver, Washington.  The members of Domain are all citizens of the State of Massachusetts. Domain is in the business of, among other things, registering domain names.  It conducts business in and advertises in all of the United States and registers domain names for persons and entities from all of the United States, including but not limited to Illinois.  Plaintiff does not allege that Domain has engaged in any misconduct but, as described below, names Domain as a defendant because it may be necessary to include Domain in order to obtain complete relief.

5.    This Court has subject matter jurisdiction on two grounds.  First, pursuant to 28 U.S.C § 1332, this Court has subject matter jurisdiction because there is complete diversity of citizenship between the Plaintiffs (citizens of Illinois and India) and the Defendants (citizens of Canada, Washington and Massachusetts), and the amount in controversy, exclusive of interest and costs, exceeds $75,000.00.  Second, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Count I arises under federal law.

6.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because, among other things, a substantial part of the events and omissions giving rise to these claims occurred in this judicial district, and a substantial part of the property that is subject to this action is situated in this judicial district.

**BACKGROUND FACTS**

7.    In or about June 2014, Zelinsky approached J.R.K. Rao of Rage to discuss a business idea.  In or about January 2015, Zelinsky approached Jay Myers, a director of Bold, to discuss this same idea.  Zelinsky proposed that the parties establish a commercial enterprise: a website through which businesses could run online contest giveaways. Key aspects of the concept

2

included (a) the name Fishbowl Prizes (referencing physical fishbowls that small businesses put out by their cash registers to collect business cards), (b) that businesses could have an icon on their websites that customers could click to register for contests, (c) that those customers would be directed to the enterprises' website where they would register for contests; (d) that businesses could collect customer information through these registrations, which would be housed on the enterprises' website, (e) that businesses could use customer relationship management software on the website to allow businesses to analyze that information, and (f) that customers, when directed to the Fishbowl website to register for a contest for one business, would then be exposed to the contests offered by other businesses (so that these businesses could therefore obtain exposure to potential customers brought in by other businesses).

8.   The central feature of the proposed commercial enterprise was its website, which would hold all information collected from customers of the various businesses running contests, where customers would go to see what other businesses were running contests and to register for contests run by those other businesses, and where businesses would go to manage their contests and manage their customer information.

9.   Zelinsky proposed that Rage and/or one of its affiliates would write the software to run the website, and that Bold would provide other services, including marketing for the commercial enterprise and technical support for Rage.

10. Zelinsky proposed an ownership structure in which Rage and Zelinsky would form an entity (Dean Rage), and then Dean Rage and Bold would own Fishbowl Prizes, Inc.  Dean Rage would own 2/3 of Fishbowl Prizes, and Bold would own 1/3 of the company.

11. Fishbowl Prizes was formed as an Illinois corporation, through filing of the necessary papers with the Illinois Secretary of State, on or about September 8, 2015.  On or about October

30, 2015, Dean Rage, Bold and Fishbowl Prizes executed the Fishbowl Prizes, Inc. Shareholders Agreement (the "Shareholders Agreement"). A copy of the Shareholders Agreement is attached hereto as Exhibit A. Zelinsky is the President of Fishbowl Prizes.

12. Prior to formally creating Fishbowl Prizes and signing the Shareholders Agreement, the parties took steps to commence the business. For example, Rage began to write the computer code necessary to support the website and the business platform in or around the Fall of 2014. In or around June 2015, Bold registered the domain name fishbowlprizes.com with defendant Domain, and created an AWS account to host the website (which included Rage's software) on an Amazon server.

13. Bold registered the domain name fishbowlprizes.com and created the AWS account with Amazon in furtherance of Fishbowl Prizes' business. It did so because Fishbowl Prizes did not exist at that time as a corporate entity but the name needed to be secured for the enterprise. All parties understood that Fishbowl Prizes would own its own domain name and website—the core of its business—once Fishbowl Prizes was formally in existence.

14. The fishbowlprizes.com website commenced operations in July 2015 (*i.e.*, prior to Fishbowl Prizes' official formation). Since the date of its official formation, Fishbowl Prizes has operated throughout the United States and Canada, among other places, using its name (Fishbowl Prizes) and using its logo (a picture of a fishbowl), and has had over 50,000 users located in all of the United States and in Canada, among other places. During this time period, Fishbowl Prizes has also conducted advertising in all of the United States and Canada, among other places, using its name and logo.

15. Fishbowl Prizes owns a common law trademark and tradename in its name and logo in the United States and (on information and belief) in Canada, among other places.

16. Pursuant to the Shareholders Agreement and the understanding of the parties, Bold was to transfer ownership of all intellectual property, including the fishbowlprizes.com domain and the Fishbowl Prizes website, to Fishbowl Prizes.  For example, Section 5.1 of the Shareholders Agreement provides:

5.1 <u>Contribution of Intellectual Property</u>

(a) Each Shareholder shall contribute to the Company, and shall continue to contrite to the company while a Shareholder all intellectual property reasonably necessary in furtherance of the Business, which shall include the following:

(1) source and object code;
(2) trademarks, trade names and copyrights.
(3) patents or patentable inventions; and
(4) know-how and business plans.

(b) Each Shareholder shall execute such agreements and transfer documents consistent with <u>Section 5.1</u> as requested by the Board.

(c) Each Shareholder shall indemnify the other Shareholder as to any claims of infringement related to the contribution of intellectual property by such Shareholder.

17. Bold breached the Shareholders Agreement by, among other things, failing to transfer the domain name, the website and other property and rights to Fishbowl Prizes.

18. In addition, the Shareholders Agreement required Bold to provide certain services to Fishbowl Prizes.  Section 5.2 of the Shareholders Agreement provides:

5.2 <u>Services to be Performed by Bold</u>. During the term of this Agreement and subject to <u>Section 5.4</u>, Bold shall perform the following services in furtherance of the Business:

(a) contribute marketing plans, sales strategies, placement services and know-how;
(b) operate its functions from Bold's headquarters in the City of Winnipeg, Manitoba, Canada;
(c) perform front-end sales, marketing and public relations;
(d) provide input on the look, feel, functionality, and monetization of the platform;

     (e)  provide technical support in addition to that provided by Dean Rage's operations in India;

     (f)  pay all costs for the launch of the Company, including costs related to sales staff, marketing, public relations, advertising, and bandwidth;

     (g)  use Bold's graphic arts employees to improve the look of the Company's platform;

     (h)  market the Company and its services and products to Bold's existing 20,000+users and use its expertise and clout to get the app front and center on various e-commerce platforms; and

     (i)  when requested by Dean Rage and notwithstanding Section 5.3, supplement the back-end work performed by Dean Rage.

19. Beginning prior to the formation of Fishbowl Prizes, Bold performed these services, including marketing and advertising Fishbowl Prizes in all of the United States and Canada, among other places. On February 21, 2016, however, Bold informed Fishbowl Prizes that it would no longer perform any of these services. *See* email of Jay Myers to Dean Zelinsky dated February 21, 2016, a copy of which is attached hereto as Exhibit B. Bold in fact failed to perform these services after this date, thereby breaching the Shareholders Agreement.

20. On March 3, 2016, Fishbowl Prizes asked Bold to transfer the website (*i.e.*, the AWS account on the Amazon server) to Fishbowl Prizes, and informed Bold that Peter Mondlock would handle the technical aspects of the transfer. Bold resisted transferring the website. *See* string of email between Dean Zelinsky and Jay Myers dated March 3, 2016, a copy of which is attached hereto as Exhibit C.

21. On March 8, 2016, Fishbowl Prizes asked Bold to transfer the domain name registration to Fishbowl and repeated its request to transfer the website. Bold initially indicated that it was willing to make these transfers but then stalled and stopped responding to Mr. Zelinsky. *See* string of text messages between Dean Zelinsky and Jay Myers from March 8 to March 11, 2016, a copy of which is attached hereto as Exhibit D.

22. On March 11, 2016, Bold finally responded by stating that it wanted to withdraw from Fishbowl Prizes and demanding $100,000 for its ownership interest. Bold ignored Fishbowl Prizes' request that Bold transfer the domain name and website. *See* email of Jay Myers to Dean Zelinsky dated March 11, 2016, a copy of which is attached hereto as Exhibit E.

23. Having heard nothing about the transfers, on March 14, 2016, Fishbowl Prizes reiterated its request for Bold to transfer of the domain name and website. Bold then responded on March 16, 2016, stating that it would not discuss transfer of the domain name and website until Fishbowl Prizes agreed to buy out its equity interest. *See* email string between Jay Myers and Dean Zelinsky, a copy of which is attached hereto as Exhibit F. Bold was holding the domain name and website hostage.

24. Eventually, Mr. Zelinsky was able to get Mr. Myers to schedule a call with him at 10:00 a.m. on Friday, March 18, 2016. During that call, Mr. Myers promised that Bold would transfer registration of the domain name and transfer the website to Fishbowl Prizes that day.

25. Bold did not transfer the domain name or the website on March 18, 2016. Instead, on March 19, 2016, Mr. Myers sent a series of text messages that alternately promised to make the transfers at a later date and made new excuses as to why Bold would not immediately transfer the domain name and website. *See* string of text message exchanges between Jay Myers and Dean Zelinsky, attached hereto as Exhibit G. In addition, Mr. Myers repeated that he wanted Fishbowl Prizes to agree to buy out Bold's equity interest before Bold would transfer the domain name and website. Id.

26. Mr. Myers' excuses do not relieve Bold of its duty to comply with its obligations to turn over the domain name and website. Further, Mr. Myer's claim that the transfer is not

advisable for technical reasons is irrelevant—this decision is within the scope of Mr. Zelinsky's business judgment as the President of Fishbowl Prizes, and is not one for Mr. Myers to make.

27. Mr. Myers excuses are also wrong. Transferring ownership of a domain name does not implicate difficult technical issues. Further, Mr. Zelinsky has retained Peter Mondlock, who has the technical expertise to manage these transfers and operations thereafter. Tellingly, Mr. Myers declined to have Bold communicate with Mr. Mondlock to verify his experience despite Mr. Zelinsky's offer to make him available. *See* Exhibit G. Mr. Myers had known that Mr. Mondlock was Fishbowl Prizes' technical expert since March 3, 2016. *See* Exhibit C.

28. On March 21, 2016, Fishbowl Prizes (through counsel) sent correspondence demanding that Bold turn over the domain name, the website (*i.e.*, the AWS account at Amazon), and accounts controlling other critical applications ("apps") that integrate into the website. A copy of this demand is attached hereto as Exhibit H.

29. Mr. Myers rejected the demand, and instead raising some of the same excuses he had previously raised. *See* text exchanges between Mr. Myers, Mr. Zelinsky and counsel, a copy of which is attached hereto as Exhibit I.

30. Bold's refusal to turn over the intellectual property to Fishbowl Prizes irreparably harms Fishbowl Prizes in that, among other things, (a) Bold, a disgruntled minority shareholder, can shut down Fishbowl Prizes entire business at any time due to its control of the domain name, the website, and the app accounts; and (b) Fishbowl Prizes cannot make investments of time and labor to make necessary upgrades to the website with the risk that Bold could terminate access at any time.

31. Fishbowl Prizes does not have an adequate remedy at law. Monetary damages are insufficient to fully compensate Fishbowl Prizes for the losses it would suffer if Bold does not

transfer the domain name, the website and the app accounts to Fishbowl Prizes—in part because there can be some uncertainty in projecting lost profits. Nevertheless, the value of the assets at risk is greater than $75,000, exclusive of interest and costs, because the entire business is at risk and Fishbowl Prizes' business is worth more than $75,000. Indeed, Bold has demanded $100,000 for its 1/3 interest in Fishbowl Prizes.

32. The balance of hardships favors Fishbowl Prizes in that, if the Court fails to grant an injunction, Bold can destroy Fishbowl Prizes' entire business. On the other hand, an injunction would only require Bold to do what it is legally required to do under the Shareholders Agreement. Further, an erroneous injunction would not cause Bold any injury because it cannot use the domain name and website for any purpose other than supporting the business of Fishbowl Prizes—and the domain name and website could be returned if necessary.

33. Domain is named as a defendant solely because, to enforce an injunction, it may be necessary for Domain, as the registrar of the fishbowlprizes.com domain name, to take action to either freeze or transfer the domain name account.

**COUNT I:**
**CYBERPIRACY**
**(Violation of 15 U.S.C. § 1125(d))**

1. – 33.   Plaintiffs incorporate the allegations of Paragraphs 1 - 33 above as their allegations of Paragraphs 1 – 33 of Count I.

34. Fishbowl Prizes owns the trademark and tradename "Fishbowl Prizes."

35. Bold continues to hold the registration of the domain name "fishbowlprizes.com."

36. That domain name is identical to and/or confusingly similar to the trademark and tradename owned by Fishbowl Prizes.

37. Bold has a bad faith intent to profit from the trademark and tradename owned by Fishbowl Prizes. Among other factors, Bold is holding the domain name hostage, using it to try to force the Plaintiffs to purchase Bold's minority interest. Bold has no reasonable or good faith reason to believe that its retention of the domain name is fair use or otherwise lawful.

38. Fishbowl Prizes and Dean Rage have been damaged by Bold's actions, in an amount to be proven at trial.

39. Bold has violated 15 U.S.C. § 1125(d). Such violation was willful.

WHEREFORE, Fishbowl Prizes and Dean Rage respectfully request that this Court enter judgment against Bold (or, partially in the alternative, Domain as described in Paragraph B below) as follows:

A. An injunction directing Bold to (i) transfer registration of the domain name to Fishbowl Prizes; (ii) transfer ownership of the website (*i.e.*, the AWS account at Amazon) to Fishbowl Prizes and provide credentials and access to all related files (including the DNS Zone file); and (iii) provide credentials and full access and administrative control over the Google Apps for Business Account and for other applications, including but not limited to Shopify, Mandrill, MailChimp, Facebook, Twitter, Weebly, Magento and Big Commerce;

B. In the alternative to A(i), an injunction directing Domain to transfer registration of the domain name to Fishbowl Prizes and/or freezing the registration so that Bold cannot change or transfer it without Court order;

C. Compensatory damages or, if Plaintiffs so choose at a later date, statutory damages pursuant to 15 U.S.C. § 1117(d);

D. Treble damages pursuant to 15 U.S.C. § 1117(a);

10

E.  Attorneys' fees pursuant to 15 U.S.C. § 1117(a); and

F.  Costs.

**COUNT II:**
**BREACH OF CONTRACT**

1. – 33.    Plaintiffs incorporate the allegations of Paragraphs 1 - 33 above as their

allegations of Paragraphs 1 – 33 of Count II

40. The Shareholders Agreement and the understanding of the parties requires Bold to

turn the property described in Fishbowl Prize's demand letter (Exhibit I) over to Fishbowl Prizes.

41. Bold has refused to do so.

42. Bold has also refused to perform the services it is required to perform under the

Shareholders Agreement.

43. Bold has breached the Shareholders Agreement.

44. Fishbowl Prizes and Dean Rage have been damaged by Bold's breaches of the

Shareholders Agreement, in an amount to be determined at trial.

45. Fishbowl Prizes and Dean Rage have performed all of their obligations under the

Shareholders Agreement.

WHEREFORE, Fishbowl Prizes and Dean Rage respectfully request that this Court enter

judgment against Bold as follows:

A.  An injunction directing Bold to (i) transfer registration of the domain name to

Fishbowl Prizes; (ii) transfer ownership of the website (*i.e.*, the AWS account at

Amazon) to Fishbowl Prizes and provide credentials and access to all related files

(including the DNS Zone file); and (iii) provide credentials and full access and

administrative control over the Google Apps for Business Account and for other

applications, including but not limited to Shopify, Mandrill, MailChimp, Facebook, Twitter, Weebly, Magento and Big Commerce;

B.  Compensatory damages; and

C.  Costs.

FISHBOWL PRIZES, INC. and
DEAN RAGE DEVELOPMENT, LLC

Date:   March 22, 2016                    By:   /s/ Bradley S. Block
                                                One of their Attorneys

Bradley S. Block
Law Offices of Bradley Block
707 Skokie Blvd.
Suite 600
Northbrook, IL 60062
(224) 533-1075
(224) 533-1076 (fax)
brad.block@bradblocklaw.com

EXHIBIT A

## FISHBOWL PRIZES INC.
## SHAREHOLDERS AGREEMENT

This SHAREHOLDERS AGREEMENT (this "Agreement") is made as of _Oct 30_ 2015 by and among the shareholders identified on Exhibit A hereto and executing this Agreement (each, a "Shareholder" and collectively, the "Shareholders") and Fishbowl Prizes Inc., an Illinois corporation (the "Company").

R E C I T A L S

A.     The Company engages and will engage in the design, development, marketing, licensing, and sale of various products and services related to e-commerce activities and contests (collectively, the "Business").

B.     The authorized capital stock of the Company consists of 100,000 shares of common stock, no par value per share (the "Shares"), of which 15,000 Shares are issued and outstanding as of the date hereof.

C.     The Shareholders own all the Shares and each Shareholder owns that number of Shares set forth opposite such Shareholder's name on Exhibit A hereto.

D.     The parties to this Agreement desire to provide for certain restrictions on voting and the disposition of the Shares, to create certain options with respect to the Shares, and to agree to certain other matters, all upon the terms, conditions and provisions set forth herein.

A G R E E M E N T S

NOW, THEREFORE, the parties agree as follows:

1.     Definitions.

1.1.     The capitalized terms listed below shall have the following definitions:

"Act" means the Securities Act of 1933, as amended.

"Affiliate" with respect to any Person, means: (i) any other Person owning more than 50% of the voting or beneficial interests of the subject Person; (ii) any other Person directly or indirectly controlling, controlled by or under common control with the subject Person; (iii) any manager, officer, director, trustee or general partner of the subject Person; (iv) any individual who is a Family Member of the subject Person; (v) any trust for the benefit of the subject Person; or (vi) any trust for the benefit of any Family Member of the subject Person.

"Applicable Law" means the provisions of all applicable statutes and laws of the United States of America, the states thereof (including the Act), and all other countries in which the Company is then doing business.

"Articles" means the Company's Articles of Incorporation, as amended.

"Board" means the Board of Directors of the Company.

"Bold" means Bold Labs Inc., a company organized under the laws of Canada.

"Change of Control" means, as to a Shareholder, any change in the ownership of the direct or indirect voting interests of such Shareholder, in one or more related transactions, that results in such Person or Persons owning more than 50% of the voting interests of such

{00049126 4}

Shareholder as of the date of this Agreement no longer owning more than 50% of the voting interests of such Shareholder.

"Dean Rage" means Dean Rage Development LLC, an Illinois limited liability company.

"Family Member" means, with respect to any individual, such individual's spouse, children and grandchildren.

"Permitted Transferee" means a Person to whom Shares are Transferred pursuant to Section 3.2.

"Person" means any individual, corporation, partnership, association, limited liability company, trust, estate or other entity.

"Sale of the Company" means any transaction pursuant to which the Company sells its property or business by (i) a sale or conveyance of all or substantially all the Company's properties or assets to any Person, (ii) a sale or conveyance of a majority of the issued and outstanding Shares to any Person or (iii) a merger or consolidation of the Company with any Person pursuant to which the Shareholders (and their Affiliates) immediately prior to such merger or consolidation shall own, immediately after giving effect thereto, less than a majority of the equity interest of the surviving entity (or its parent) or the purchasing entity (or its parent), as the case may be.

"Shareholders" means each party to this Agreement, other than the Company, and any Person to whom Shares are hereafter issued or sold by the Company and who joins in and agrees to be bound by this Agreement; and a "Shareholder" means each of the Persons referred to in this subsection.

"Transfer" means any transfer, sale, assignment, pledge, encumbrance or other disposition, whether effected voluntarily or involuntarily, by operation of law or otherwise (including in connection with a dissolution of marriage), or whether *inter vivos* or upon death.

"Transfer Notice" means a notice of a proposed Transfer.

2.    **Voting Provisions Regarding Board of Directors**.

2.1.    Size of the Board. Each Shareholder agrees to vote, or cause to be voted, all Shares owned by such Shareholder, or over which such Shareholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that the size of the Board shall be set at 3 directors.

2.2.    Board Composition. Each Shareholder agrees to vote, or cause to be voted, all Shares owned by such Shareholder, or over which such Shareholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that at each annual or special meeting of shareholders at which an election of directors is held or pursuant to any written consent of the shareholders, the following persons shall be elected to the Board:

(a)    Two persons designated by Dean Rage; and

(b)    One individual designated by Bold.

2.3.    Failure to Designate a Board Member.  In the absence of any designation from the Persons or groups with the right to designate a director as specified above, the director previously designated by them and then serving shall be reelected if still eligible to serve as provided herein.

2.4.    Removal of Directors. Each Shareholder agrees to vote, or cause to be voted, all Shares owned by such Shareholder, or over which such Shareholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that:

(a)    no director elected pursuant to Section 2.2 may be removed from office unless such removal is directed or approved by the affirmative vote of the Shareholder with the right to designate such member of the Board pursuant to Section 2.2;

(b)    any vacancies created by the resignation, removal or death of a director elected pursuant to Section 2.2(a) or 2.2(b) shall be filled pursuant to the provisions of this Section 2; and

(c)    upon the request of any Shareholder entitled to designate a director as provided in Section 2.2(a) or 2.2(b) to remove such director, such director shall be removed.

All Shareholders agree to execute any written consents required to perform the obligations of this Agreement, and the Company agrees at the request of any party entitled to designate directors to call a special meeting of shareholders for the purpose of electing directors.

2.5.    Manner of Acting by the Board. Unless the act of a greater number is required by statute or the Articles, the act of majority of the directors either (a) present at a meeting of the Board at which a quorum is present or (b) by the written consent of a majority of the directors comprising the Board, shall be the act of the Board.

3.    **Transfer Restrictions.**

3.1.    Notice of Transfer of Shares. Except for Shares Transferred by the Company and Shares transferred pursuant to Sections 3.2 or 4.6, no Shares shall be Transferred unless the proposed transferor ("Transferor") first serves a Transfer Notice upon the Company and the other Shareholders and thereafter complies with the provisions of this Section 3. A Transfer Notice may not be served unless the Transferor proposing to Transfer Shares has received a bona fide written offer for the acquisition of the Shares sought to be Transferred, in which event the Transfer Notice may be served only with respect to such offer. The person to whom the Transferor shall desire to Transfer Shares shall be herein referred to as the "Transferee".

3.2.    Permitted Transfers. Shares may be Transferred by a Shareholder or a Permitted Transferee: (a) with the prior approval of the Board, which approval may be withheld in the Board's sole discretion; (b) to or among such Shareholder's or Permitted Transferee's Family Group (as used herein, "Family Group" means an individual's spouse and lineal descendants and any trust, limited partnership or other fiduciary relationship solely for the benefit of such individual and/or such individual's spouse and/or lineal descendants), with the prior approval of the Board; (c) upon the death of such Shareholder or Permitted Transferee to his or her executors or administrators or legal successors, including trustee(s); or (d) upon a Change of Control of a Shareholder that has been approved in advance by the Board, provided that no such approval by the Board shall be required in connection with a corporate reorganization of either Shareholder in which the Shares are Transferred to their respective Affiliates. Such Shares shall be subject after such Transfer to (i) this Agreement and (ii) in the case of a Transfer requiring approval by the Board under clause (a) of the foregoing sentence, any additional restrictions on Transfer, not inconsistent with such rights, as may be imposed by the Board as a condition to giving such approval. Following any Transfer permitted pursuant to this Section 3.2, the Permitted Transferee of such Shares shall be subject to each of the terms, conditions and provisions of this Agreement.

3.3.    Form of Transfer Notice. Each Transfer Notice shall specify (a) the number of Shares which the Transferor proposes to Transfer and the consideration per Share to be received for such Transfer; (b) the name and address of the proposed Transferee; (c) all the material terms and conditions, including the terms and conditions of payment, upon which the Transferor proposes to Transfer such Shares; and (d) the address of the Transferor to which notices of the exercise of the options herein

provided shall be sent. The Transferor shall attach to the Transfer Notice a true and correct copy of any written offer to purchase Shares received by the Transferor.

3.4.    Options. Upon the service of a Transfer Notice, options to purchase the Shares described therein shall be created, and may be exercised, as follows:

(a)    an option in the Company, exercisable by service of written notice upon the Transferor and the Shareholders within the 30 day period following the date of service of the Transfer Notice, to purchase all or any portion of the Shares described in the Transfer Notice, at the price and on the payment terms set forth in the Transfer Notice; and

(b)    an option in each Shareholder, exercisable by service of written notice upon the Transferor, the Company and the other Shareholder within the 30 day period immediately following the date of expiration of the 30 day period described in Section 3.4(a), to purchase the Shares described in the Transfer Notice which were not purchased by the Company.

3.5.    Closing of Exercise of Options. To the extent Shares are to be purchased by the Company or the Shareholders pursuant to Section 3.4, the closing of all such purchases shall take place at the principal offices of the Company on the 60th day after the expiration of the last applicable option period expired.

3.6.    Transfer if Options not Exercised. If none of the options provided in this Section 3 is exercised, or if such options were exercised with respect to less than all the Shares subject to the Transfer Notice, then, during a period of 60 days beginning on the day following the date of expiration of the last applicable option period, the Transferor may Transfer all, but not less than all, Shares sought to be Transferred to the Person identified in the Transfer Notice as the Transferee and for which the options provided in this Article II were not exercised, at the price and on the same material terms and conditions as specified in the Transfer Notice. If such Shares are not so Transferred, such Shares shall remain subject in all respects to the terms of this Agreement and may not thereafter be Transferred except in compliance with all terms, conditions and provisions of this Agreement.

3.7.    Additional Restrictions on Transfers of Shares. No Shareholder shall Transfer any of such Shareholder's Shares or any interest therein unless (a) the Company, at its option, shall have received a written opinion of counsel reasonably satisfactory to the Company to the effect that the proposed Transfer need not be registered under the Act or under applicable state securities laws, and (b) the Company shall have received such representation letters as the Company shall request, in form and substance reasonably satisfactory to the Company, to ensure compliance with the provisions of the Act and applicable state securities laws.

3.8.    Remedies. Each Shareholder agrees and acknowledges that such Shareholder's violation or breach of the covenants contained in this Section 3 shall cause the Company and the other Shareholders irreparable injury. In addition to any other right or remedy available to the Company or the other Shareholder at law or in equity, each Shareholder acknowledges and agrees that the Company or the other Shareholder shall be entitled to enforcement by court injunction or specific performance of the obligations of the Company and the other Shareholder hereunder and each Shareholder hereby agrees not to object to any such enforcement.

3.9.    Effect of Shares in Hands of the Transferee. Shares that are Transferred to a Transferee shall thereafter continue to be subject to all restrictions on Transfer that are contained in this Agreement, and the Transferee must comply with the provisions of this Section 3 if such Transferee shall propose to Transfer any such Shares, as if the Transferee were a Shareholder. However, the Transferee shall not have any of the rights or options which are given to Shareholders pursuant to the provisions of this Agreement.

3.10.    General Effect of Section 3. Unless a Transfer of Shares is made in accordance with the provisions of this Agreement, such Transfer shall not be valid or have any force or effect. The restrictions

on Transfer set forth herein are intended to ensure, among other matters, compliance with the Act. The restrictions in this Agreement are intended to be cumulative and the Shareholders agree that the Shareholders shall not Transfer any Shares except as set forth herein. The Company shall not (a) Transfer upon its books and records any Shares Transferred to any Person in violation of this Agreement or (b) treat as the owner of such Shares or accord the right to vote as owner or pay dividends or any other distribution to any transferee to whom such Shares shall have been Transferred in violation of this Agreement.

3.11. <u>Transferability of Certain Shares</u>. Shares issued to the Shareholders by the Company pursuant to a stock dividend, stock split, reclassification or like action, or pursuant to the exercise of a right granted by the Company to all its holders of Shares to purchase Shares on a proportionate basis, shall be Transferred only, and for all purposes be treated, in the same manner as, and be subject to the same options with respect to, the Shares that were split or reclassified or with respect to which a stock dividend was paid or rights to purchase Shares on a proportionate basis were granted. In the event of a merger of the Company in which the Company is not the survivor and which is made solely for the purpose of changing the state of incorporation of the Company or effecting a recapitalization of the Company, shares of stock or securities convertible into shares of stock that are issued in exchange for Shares shall thereafter be deemed to be Shares that are subject to the terms of this Agreement.

3.12. <u>Transfers of Shares</u>. Any Person to whom Shares are to be Transferred pursuant to this Agreement shall execute and deliver, as a condition to such Transfer, whatever documents are deemed reasonably necessary by the Company, in consultation with its counsel, to evidence such Person's joinder in, acceptance of, and agreement with, the obligations contained in this Agreement.

3.13. <u>Restriction on the Company's Right to Purchase</u>. Notwithstanding anything to the contrary contained in this Agreement, the Company may not exercise any option to purchase such number of Shares as the Company may then be prohibited by law or contract from purchasing, including the applicable corporate law of the Company's state of incorporation and covenants contained in the Company's loan agreements or other agreements in effect at that time.

4. **Drag-Along Right**. In the event that the holders of a majority of the issued and outstanding Shares (the "<u>Electing Holders</u>") approve a Sale of the Company in writing, specifying that this <u>Section 4</u> shall apply to such transaction, then each Shareholder hereby agrees:

(a) if such transaction requires shareholder approval, with respect to all Shares that such Shareholder owns or over which such Shareholder otherwise exercises voting power, to vote (in person, by proxy or by action by written consent, as applicable) all Shares in favor of, and adopt, such Sale of the Company (together with any related amendment to the Articles required in order to implement such Sale of the Company) and to vote in opposition to any and all other proposals that could reasonably be expected to delay or impair the ability of the Company to consummate such Sale of the Company;

(b) if such transaction is a stock sale, to sell the same proportion of shares of capital stock of the Company held by such Shareholder as is being sold by the Electing Holders to the Person to whom the Electing Holders propose to sell their Shares on the same terms and conditions as the Electing Holders;

(c) to execute and deliver all related documentation and take such other action in support of the Sale of the Company as shall reasonably be requested by the Company or the Electing Holders in order to carry out the terms and provisions of this <u>Section 4</u>, including executing and delivering instruments of conveyance and transfer, and any purchase agreement, merger agreement, indemnity agreement, escrow agreement, consent, waiver, governmental filing, share certificates duly endorsed for transfer (free and clear of impermissible liens, claims and encumbrances), and any similar or related documents;

(d)  not to deposit, except as provided in this Agreement, any Shares owned by such Shareholder in a voting trust or subject any Shares to any arrangement or agreement with respect to the voting of such Shares, unless specifically requested to do so by the acquiror in connection with the Sale of the Company; and

(e)  to refrain from exercising any dissenters' rights or rights of appraisal under applicable law at any time with respect to such Sale of the Company.

5.  **Special Provisions Concerning the Services of the Shareholders**.

5.1.  Contribution of Intellectual Property.

(a)  Each Shareholder shall contribute to the Company, and shall continue to contribute to the Company while a Shareholder, all intellectual property reasonably necessary in furtherance of the Business, which shall include the following:

(i)  source and object code;

(ii)  trademarks, trade names, and copyrights;

(iii)  patents or patentable inventions; and

(iv)  know-how and business plans.

(b)  Each Shareholder shall execute such agreements and transfer documents consistent with Section 5.1 as requested by the Board.

(c)  Each Shareholder shall indemnify the other Shareholder as to any claims of infringement related to the contribution of intellectual property by such Shareholder.

5.2.  Services to be Performed by Bold.  During the term of this Agreement and subject to Section 5.4, Bold shall perform the following services in furtherance of the Business:

(a)  contribute marketing plans, sales strategies, placement services, and know-how;

(b)  operate its functions from Bold's headquarters in the City of Winnipeg, Manitoba, Canada;

(c)  perform front-end sales, marketing, and public relations;

(d)  provide input on the look, feel, functionality, and monetization of the platform;

(e)  provide technical support in addition to that provided by Dean Rage's operations in India;

(f)  pay all costs for the launch of the Company, including costs related to sales staff, marketing, public relations, advertising, and bandwidth;

(g)  use Bold's graphic arts employees to improve the look of the Company's platform;

(h)  market the Company and its services and products to Bold's existing 20,000+ users and use its expertise and clout to get the app front and center on various e-commerce platforms; and

(i)     when requested by Dean Rage and notwithstanding Section 5.3, supplement the back-end work performed by Dean Rage.

5.3.    Services to be Performed by Dean Rage. During the term of this Agreement and subject to Section 5.4, Dean Rage shall perform the following services in furtherance of the Business:

(a)     manage the back-end building of the Company's platform, customer support and most back-end issues; and

(b)     manage the Company's banking relationships in the State of Illinois, USA.

(c)     all General and Administrative of the business activities, Retail Marketing and Public Relations, Brand Building, Support.

5.4.    Termination of Certain Services.  At such time as the Company shall be financially capable of providing for its own dedicated IT, sales, marketing, and operations staff, as the same is determined by the Board, each of Bold and Dean Rage shall be released from their respective obligations under Sections 5.3 and 5.4.

5.5.    Distributions of Cash to Shareholders.  The Shareholders agree that all distributions of cash by the Company to the Shareholders, whether in the nature of annual, special or liquidating dividends, executive salaries or service payments, shall be in proportion to the ownership percentages set forth on Exhibit A.

**6.      Issuance of Additional Securities.**

In the event the Board determines that additional funds are necessary for the operation of the business and affairs of the Company, the Board shall have the right, with the prior written consent of Bold, to cause the Company to issue (a) additional shares of capital stock or other equity interests in the Company (including creating other classes or series thereof having different rights), (b) obligations, evidences of indebtedness or other securities or interests convertible or exchangeable into shares of capital stock or other equity interests in the Company and (c) warrants, options or other rights to purchase or otherwise acquire shares of capital stock or other interests in the Company (collectively, "Equity Securities"). Such Equity Securities may be issued from time to time on terms and conditions determined by the Board, in one or more classes or series, with such designations, references and rights as shall be fixed by the Board in its reasonable discretion. The Board in so fixing the designations, rights and preferences of any class or series of Equity Securities may designate such Equity Securities as "Preferred Shares" or any other designation.  The Board is hereby authorized to take all actions that they deem necessary or appropriate in connection with the issuance of Equity Securities and the fixing of the designations, preferences and rights. Without limiting the foregoing, the Shareholders agree that the Board may issue Equity Securities to any officer, director or Shareholder of the Company in compensation for such officer, director or Shareholder having guaranteed or guaranteeing any obligations of the Company, including debt obligations, upon such terms and conditions (and based upon such values) as the Board reasonably determines.

**7.      Termination of Agreement.**

7.1.    This Agreement shall be terminated:

(a)     by the written consent of all Shareholders;

(b)     upon the sale by the Company of all or substantially all its assets to a single purchaser or a related group of purchasers in a single transaction or a related series of transactions;

(c)     upon a merger or consolidation of the Company as a result of which the Shareholders' percentage of ownership of the surviving or resulting entity is less than 50%; or

(d)     upon the acquisition by one Shareholder of all the Shares that are then subject to this Agreement.

7.2.     The termination of this Agreement for any reason shall not affect any right or remedy existing hereunder prior to the effective date of termination.

7.3.     From and after the date a Shareholder ceases to own any Shares, such Shareholder shall no longer be deemed to be a Shareholder and all rights and obligations of such Shareholder hereunder shall terminate.

8.     **Restrictive Covenants**.

8.1.     Each Shareholder recognizes and acknowledges that such Shareholder will be entrusted with or have access to confidential or proprietary information which is the property of the Company or third parties to which the Company owes a duty of confidentiality (whether pursuant to Applicable Law, by contract or otherwise). Each Shareholder therefore agrees that, at all times during and after such Shareholder is an Shareholder, such Shareholder shall (a) not, without the prior written consent of the Board, directly or indirectly, use, copy or duplicate, or disclose or otherwise make available to any third party, any Confidential Information (as defined below) other than in the performance of such Shareholder's duties with respect to the Company, (b) take such protective measures as may be reasonably necessary to preserve the secrecy and interest of the Company (or, if applicable, of a third party to which the Company owes a duty of confidentiality) in the Confidential Information and (c) not, without the prior written consent of the Board, utilize or convert Confidential Information for such Shareholder's own benefit or gain, of whatever nature other than in performance of such Shareholder's duties with respect to the Company. As used herein, the term "Confidential Information" shall mean trade secrets and other non-public information, whether tangible or intangible, in any form or medium, relating to the business or affairs of the Company that is proprietary to the Company (or relating to the business or affairs of a third party to which the Company owes a duty of confidentiality) and which the Company makes reasonable efforts to keep confidential.

8.2.     Each Shareholder acknowledges that (a) to the extent permitted by Applicable Law, all Work (as defined below) shall be deemed a "work made for hire" within the meaning of that term under United States Copyright Act, 17 U.S.C. § 101 et seq., as amended or superseded, and (b) the Company shall be deemed the exclusive author of such Work and the exclusive owner of all rights, title and interest in and to such Work in any and all media, languages, territories and jurisdictions throughout the world, now known or hereafter devised. For purposes of this Agreement, "Work" means all intellectual property which any Shareholder alone or jointly creates, conceives, develops, reduces to practice on or after the date hereof, or causes another to create, conceive, develop or reduce to practice, on or after the date hereof. Notwithstanding anything in this Agreement to the contrary, the definition of "Work" does not include, and this Agreement does not apply to, any invention developed by any such Shareholder (i) entirely on his, her or its own time and (ii) without the use of any equipment, supplies, facilities or trade secret information of the Company, unless such invention (x) relates to business of the Company or its actual or demonstrably anticipated research or development or (y) results from any work or services performed by any such Shareholder for or on behalf of the Company.

8.3.     During the term of this Agreement, each Shareholder shall not, directly or indirectly, as agent, employee, consultant, distributor, representative, equity holder, manager, partner or in any other capacity, own (other than through the passive ownership of less than 5% of the publicly traded shares of any Person), operate, manage, control, engage in, invest in (other than through the passive ownership of less than 5% of the publicly traded shares of any Person) or participate in any manner in, act as a consultant or advisor to, render services for (alone or in association with any person), or otherwise assist any person that directly engages in or owns, invests in, operates, manages or controls any venture or enterprise that engages in the Business any place the Company or its Affiliates engages in the Business;

provided that for purposes of this Section 8.3, "Business" shall be limited to products and services relating to a Software platform designed to facilitate and automate a prize give-away through an online contestant entry form.

8.4.    While the restrictions set forth in this Section 8 are considered by the Shareholders to be reasonable in all circumstances, it is agreed that if any court of competent jurisdiction shall deem such restrictions to go beyond that which is reasonable in all circumstances for the protection of the legitimate interests of the Company or the Shareholders, the court shall modify the restrictions at issue to the point of greatest restriction permissible by Applicable Law.

8.5.    Each Shareholder acknowledges and agrees that the covenants set forth in this Section 8 (collectively, the "Restrictive Covenants") are reasonable and necessary for the protection of the Company's business interests, that the other Shareholders would not have purchased Shares or entered into this Agreement without such Restrictive Covenants, that irreparable injury will result to the Company if any Shareholder breaches any of the terms of the Restrictive Covenants, and that, in the event of any Shareholder's actual or threatened breach of any of the Restrictive Covenants, the Company will have no adequate remedy at law. Each Shareholder accordingly agrees that in the event of any actual or threatened breach by such Shareholder of any of the Restrictive Covenants, the Company shall be entitled to immediate temporary injunctive and other equitable relief, without the necessity of showing actual monetary damages or of posting any bond or other security. Nothing contained herein shall be construed as prohibiting the Company from pursuing any other remedies available to it for such breach or threatened breach, including the recovery of any damages.

9.    **Miscellaneous**.

9.1.    Notices. All notices required hereunder shall be in writing and shall be deemed served when delivered personally or five business days after deposit in the United States mail, certified mail, return receipt requested, addressed to the persons for whom intended at the following respective addresses:

> The Company:
> Fishbowl Prizes Inc.
> 325 Briar Lane
> Highland Park, IL 60035
> Attention: Dean Zelinsky

Any Shareholder at the last known address of such Shareholder as disclosed by the books and records of the Company or to such other persons and/or at such other addresses as may be designated by written notice served in accordance with the provisions hereof.

9.2.    Legend on Certificates. All certificates evidencing Shares which are subject to this Agreement shall bear the following legend:

> "The sale, transfer and encumbrance of the shares represented by this certificate are subject to a certain Shareholders Agreement between the corporation and certain of its shareholders. A copy of such Shareholders Agreement is on file in the office of the secretary of the corporation. In addition, the shares represented by this certificate have not been registered under the Securities Act of 1933, as amended."

Upon termination of this Agreement, certificates for Shares may be surrendered to the Company in exchange for new certificates without the foregoing legend.

9.3.    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall constitute one instrument.

9.4.    Entire Agreement. This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, including any prior non-competition and non-solicitation agreements executed by a Shareholder with the Company. Any amendments to this Agreement must be made in writing and duly executed by each of the parties entitled to adopt such amendment or by an authorized representative or agent of each such party.

9.5.    Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties, their heirs, representatives, successors and permitted assigns.

9.6.    Applicable Law. This Agreement shall be governed as to validity, construction and in all other respects by the laws of the State of Illinois applicable to contracts made therein.

9.7.    Severability. The invalidity of any provision of this Agreement or portion of a provision shall not affect the validity of any other provision of this Agreement or the remaining portion of the applicable provision.

9.8.    Legal Counsel. The Company and Dean Rage have engaged Roberts McGivney Zagotta LLC ("RMZ") as legal counsel to them. Each other Shareholder (a) approves RMZ's representation of the Company and Dean Rage in the preparation of this Agreement and other matters involving the Company, its Affiliates, and Dean Rage; (b) acknowledges that no legal counsel has been engaged by the Company to protect or otherwise represent the interests of the other Shareholder and that actual or potential conflicts of interest may exist between such other Shareholder and the Company in connection with the preparation of this Agreement and other matters involving the Company and its Affiliates; and (c) acknowledges that such Shareholder has been afforded the opportunity to engage and seek the advice of such Shareholder's own legal counsel before entering into this Agreement. In addition, each Shareholder (i) acknowledges that RMZ has represented, and continues to represent, the Company (and its Affiliates) and acknowledges the possibility of a future conflict or dispute between such Shareholder and/or other Shareholders and the Company; and (ii) agrees that RMZ may represent the Company (and its Affiliates) in connection with any such conflict or dispute with the Shareholders. TO THE EXTENT THAT THE FOREGOING CONSTITUTES A CONFLICT OF INTEREST, EACH MEMBER HEREBY EXPRESSLY WAIVES ANY SUCH CONFLICT OF INTEREST.

**SIGNATURE PAGE TO FOLLOW**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

FISHBOWL PRIZES, INC.

By: _____
Name: Dean Zelinsky
Title: President

DEAN RAGE DEVELOPMENT LLC

By: _____
Name: Dean Zelinsky
Title: Manager

BOLD LABS INC.

By: _____
Name: Jason Myers
Title: Director

Exhibit A

## SCHEDULE OF SHAREHOLDERS

| Shareholders | Number of Shares of Common Stock |
|---|---|
| Dean Rage Development LLC | 10,000 |
| Bold Labs Inc. | 5,000 |

EXHIBIT B

**From:** Jay Myers <jay@boldcommerce.com>
**Subject: moving forward**
**Date:** February 21, 2016 at 9:50:25 PM CST
**To:** Dean Zelinsky <dean@deanzelinsky.com>
**Cc:** Yvan Boisjoli <yvan@boldapps.net>

Hey Dean

I'm really sorry for the time it's taken to get back to you on this. There's been a lot of meetings and discussion over here about what we want to do. So I thought we needed to get ourselves all in alignment before we replied.

There's a few things we're struggling with and we're just trying to figure out what's best for us. Here's were our thoughts are. We partnered on the project with the understanding that we'd be responsible for marketing it. For the last 9 months we've had a Scott on it essentially full time, and, at various times, a few other people. Probably totaling another couple months worth of time. We've also been covering the server bills of roughly $1,000 a month. The salaries of everyone and all the other costs are probably close to $100k.

I don't want to beat around the bush, so I'll just say it as it is. We're frustrated that we've had do so much more than we originally agreed to, and we feel that if we aren't involved every step of the way this project wouldn't get done. If we invested the same amount of time into building it ourselves, it would have been done in half the time, and probably be making 3 times as much revenue by now. So the question becomes, does it make sense for us to keep resources on this, or just focus on other projects?

We don't feel we can trust the developers to to build it properly. We're doing more than we signed up for, and we're contributing financially more than everyone. We're also concerned about trusting you to take on all the support and other aspects of the business. Scott should not be doing support but he's passionate about it and he cares. Scott's been doing essentially all the support, product design, product management, dealing with bugs and quality control, and so much more... We've been paying everyone on our side working on the project out of our own pockets, and the first sales person you wanted to hire, you wanted to use Fishbowl's money to pay for... It's a bit concerning.

I think it would be awesome if you hired a product manager, maybe a designer and bare minumum took care of managing all the support, and paying their salaries until fishbowl was at a point where it could pay all needed staff equally. Developers, marketers, support, sales, etc...

Basically, we're at a point where we feel we've over invested with partners that are not as committed and or competent. It's extremely frustrating and it's hard to decide how to move forward. Because at the end of the day, we do believe in the product.

After discussing it with everyone this week, we've decided that we do very much like Fishbowl. However, the only way everyone here feels comfortable moving forward is if we pull all our resources off until it's at a point where it's ready for marketing. This means Scott won't be doing support, product management, bug reporting, etc.

We can't afford to keep Scott on this for another 6 months working with India all day long, dealing with customers, bugs etc... When it's done, polished, and ready to go, we're comfortable investing in marketing it.

So we've told Scott to stop doing support as of now. Tomorrow he'll he working on another project we have going on here. We'll still be involved in the weekly update meetings to see how things are coming, but that's essentially it for the time being. When it's ready for marketing we'll take a bigger role.

On Friday, 19 February 2016, Dean Zelinsky <dean@deanzelinsky.com> wrote:
Hello Yvan and Jay -

Fishbowl is in a crisis situation. I sent you guys an email last Saturday (after hearing from JRK) saying we need to discuss a solution. It has been 6 days. I have reached out to you guys via email and text on 2 or 3 more occasions and still you have not responded to my Saturday email.

We were concerned about the rebuild time with JRK and it is now three weeks since the progress got stalled, still with no direction going forward. Fishbowl is currently in a stalled status!

I understand Bold is doing quite well, you guys just had a big move, you are very busy and I am extremely happy for you guys. That's your cash cow and I understand that good businesspeople don't lose sight of the cash cow. However, Fishbowl cannot suffer due to this.

I have addressed with you guys many times about the fact that you as partners, are not responsive enough to me…going weeks without the ability to pick up the phone, return a phone call and in many times, return an email. While the coding issues in India are problematic, so are partners that go dark for extended periods especially during a crisis situation. Once again, failure is not an option for me. We have proof of concept and the only thing that can hurt the company are these partner issues. I am determined not to let that happen.

In light of the above, I am gaining access to the code and having two high level developers assess what is there. Provided they do not tell me India has been negligent or is incompetent, I am planning to tell JRK to move forward with the project, rebuilding the platform and supporting what is currently there during the rebuild.

We might want to discuss hiring an architect on a part time basis to oversee the build and not relying 100% on India. The software is 100% our product and we might need to get more pro-active in the oversight of the product.

Regarding negative Shopify reviews…while we should do everything possible to mitigate the potential for bad reviews and incentivize merchants to write good reviews, we might consider removing Bold's association with Fishbowl on the Shopify site until the improved dashboard features are in place.

If you guys feel otherwise, I think you should find some time to discuss.

Have a fine weekend,
Dean

Morning Jay and Yvan -

I heard from JRK.

Roughly he is stating he has about 4100 hours in since the inception...and his billable rate is $24. That is the extent of what he said. No proposal of how to resolve so he is most likely looking to hear an offer from us using the above as a basis for his investment.

Simple math, he is talking about 100k in billable hours.

To put the hours into perspective, based on a full time employee working 2000 hours a year...he is saying the project to date was equivalent to two full time employees working one full year.

Let's discuss.

Dean

On Feb 12, 2016, at 1:00 PM, Jay Myers <jay@boldcommerce.com> wrote:

> Hey Dean,
>
> I'll wait for Yvan to respond about the code. He knows better on that. We had some thoughts on how we could remove India in a fair way but we can talk about that once we hear back from them.
>
> Yvan can speak to the code more than I can.
>
>
> **Cheers,**
> Jay Myers
> Bold Co-Founder

3



@bold_apps  |  on iTunes  |  Apps

- boldapps.net  |  Commerce boldcommerce.com

A division of **Bold Innovation Group**  Learn about who we are!

Join our team, **we're hiring!**  https://www.youtube.com/watch?v=ECzYcz1ArUA

On Fri, Feb 12, 2016 at 12:34 PM, Dean Zelinsky <dean@deanzelinsky.com> wrote:

Hello Jay and Yvan -

I had the conversation with JRK and waiting for him to come back to me with an answer/proposal.

In the meantime, can you guys have someone look at the coding and identify what is there.  I am curious about the following...
 1. Is the current code a mess or is there good logic there?
 2. Will we be able to manage the bug issues until the rebuild is done?
 3. What is it going to take in terms of time and effort to get the rebuild done with the features we need to have added?

Thanks,
Dean

EXHIBIT C

**From:** Jay Myers <jay@boldcommerce.com>
**Subject: Re: Server migration**
**Date:** March 3, 2016 at 9:55:14 PM CST
**To:** Dean Zelinsky <dean@deanzelinsky.com>
**Cc:** Yvan Boisjoli <yvan@boldapps.net>, Peter Mondlock <peter@one-ze.ro>

Hey Dean,

Thanks for looking into this. I may have missed something though, I'm not sure why we'd need to move them? They're already on their own environment and account. As I understand it, all we need to do is just have Fishbowl start paying the month bill.


Cheers,
Jay Myers
Bold Co-Founder

@bold_commerce  |  boldcommerce.com  |  *Who we are!*

Join our team, **we're hiring!**  https://www.youtube.com/watch?v=ECzYcz1ArUA

On Thu, Mar 3, 2016 at 12:23 PM, Dean Zelinsky <dean@deanzelinsky.com> wrote:
> Hello Jay and Yvan -
> Peter Mondlock (below) is going to be moving the server to a Fishbowl Prizes, Inc. server on Amazon.
> As I stated in my last email, the company will be taking over the costs.
>
> Can you have your guys assist him with whatever he needs.
>
> Thanks,
> Dean
>
>
>
>         Begin forwarded message:
>
>         **From:** peter mondlock <peter@one-ze.ro>

1

**Subject: Server migration**
**Date:** March 3, 2016 at 12:09:39 PM CST
**To:** "dean@deanzelinsky.com" <dean@deanzelinsky.com>

Hi Dean,

In order to clone the fishbowl operation, I need a few things:

1) the AMI or snapshots of the servers currently running, or their code and operating requirements (libraries, runtimes, etc)
2) a full, recent database backup
3) the server class information (m3.xlarge or m4.2xlarge etc) for all servers and which service goes on which class of server
4) the database server class information
5) any load balancer configuration information (health checks, ports, etc)
6) SSL public and private key information, along with any intermediate certificates (this should be GPG armored or otherwise sent in a very secure fashion)
7) if there are any tricky security policies or other machinery in place, I would need to know that as well
8) please let me know if I'm missing anything beyond the above

Thanks, let me know if you have any questions.

Regards,
Peter

Tue, Mar 8, 5:21 PM

Hello Jay
Thanks for that. I am having my guy look at the server account, he thinks we can save us a couple hundred a month based on the info he got from India.

Also, we need the fishbowlprizes.com domain in a Fishbowl Prizes, Inc account. Do you know where it is registered? Who can get this moved to our corporate account?

Wed, Mar 9, 9:17 AM

Morning Jay...once again, a simple request. Can you get this done today – thanks!

Thu, Mar 10, 7:35 AM

Message

Good morning Jay
I have a business to run and we are going to run on Dean time...not Bold time. Not going to send 3 emails a text make a phone call and wait a week for every answer. We need the domain moved into a Fishbowl Prizes account.

Thanks,
Dean

Thu, Mar 10, 10:16 AM

Hey Dean, Sorry for the slow reply. I was tied up all day, and again today. There's no ongoing charge with the domain, so we're not really concerned about that. We paid for it for like 5 years or so in advance. So We're

Messages (27)  **Jay Myers**  Details

Hello Jay
Happy you secured it for 5 years. The domain is IP and all ip is supposed to reside in the company. Not with a single partner. So please let's get this moved to an account in Fishbowl Prizes today.

JRK is not holding onto any ip and Bold cannot either.

**Where do you want it moved to? Does Fishbowl have a registrar set up?**

I am driving now I will get that to you shortly

**Ok cool**

Fishbowl Prizes Godaddy Account # 124395777

 

●●●●○ AT&T  LTE          1:41 PM          ≭ 63% ▉▭

Messages (27)  **Jay Myers**          Details

Thu, Mar 10, 1:01 PM

Hi Jay
Please confirm that this is being handled. Thanks, DZ

Looking into it. It will be a bit of a process. Who owns that account? Do we have access? We'll need that.

It's a Fishbowl Prizes INC account we set up. If you need access to make the transfer, let me know and I will send over identity.

●●●●● AT&T  LTE        1:42 PM          ⁕ 63% ▮▮

Messages (27)   **Jay Myers**          Details



Got it. We may need to be able to login. I'm setting up a meeting with our server guy to see how it can be as seamless as possible. Want to avoid any downtime and cacheing issues

Got it...thanks

By the way the system is running relatively flawlessly and we're handling the support in less than a half hour a day

Fri, Mar 11, 7:16 AM

Message                              

Fri, Mar 11, 7:16 AM

Our guy Peter here says the name servers need to point to the Amazon server in our Godaddy account before we transfer the domain or site will go down. You probably know that. So either I can send you login or you guys can coordinate with Peter.

Let me know ASAP.
Thanks,
Dean

Jay...we have partners in India that are very uncomfortable that you guys are hanging onto any IP especially after they put all they had into the company even though there were threats to remove them.

I told them I would get this taken care of this week and it is Friday. So we need to facilitate this transfer today.

Let me know your plans.

Thanks,
Dean

**Fri, Mar 11,** 2:43 PM

Can I get the courtesy of a response?

EXHIBIT E

**From:** **Jay Myers** jay@boldcommerce.com
**Subject:** Fishbowl
**Date:** March 11, 2016 at 7:23 PM
**To:** Dean Zelinsky dean@deanzelinsky.com, JRK jrk@whatarage.com, Yvan Boisjoli yvan@boldapps.net



Hey Dean and JRK,

I apologize for the slow responses lately. We've got a lot on the go, and my time has been getting spread thinner and thinner…

We had a meeting yesterday to discuss the bigger picture of our involvement in the project. The issue we're having on our side is that we have so many projects on the go. With us only owning a third of Fishbowl it's hard for us to justify resources to it, against products we own 100%.

This form of a partnership has been a learning experience for us.

We decided yesterday that it's to hard for us to continue this way. The idea of Fishbowl is good, it's just the structure of the partnership is hard for us. The distance, the timezones. It makes more sense to focus on products we're building internally.

So what it comes down to for us is we're ideally looking to exit. It's not fair to you guys that we don't fully commit. We've spent over $140K in salaries, servers, and other costs to this point.

Based off the current revenue, not even counting what we've put in, we'd settle with $100K for our shares and be on our way.

It's been great working with you guys, this is strictly a business decision. With where our company is going, this just doesn't fit into the picture anymore. Let me know how you'd like to proceed.

Cheers,
Jay Myers
Bold Co-Founder
 @bold_commerce |  boldcommerce.com | *Who we are!*

Join our team, **we're hiring!** https://www.youtube.com/watch?v=ECzYcz1ArUA

EXHIBIT F

**From:** **Jay Myers** jay@boldcommerce.com
**Subject:** Re: Fishbowl
**Date:** March 16, 2016 at 6:46 PM
**To:** Dean Zelinsky dean@deanzelinsky.com
**Cc:** Yvan Boisjoli yvan@boldapps.net



Dean, you're going down the wrong path here. We have no intentions on holding anything hostage. In fact, we weren't even thinking about that until you brought this all up.

We're a partner an it's in our name, it's  completely legit. We didn't create that Godaddy account, we have no access to it, and you're asking us to transfer it.

The negative review it received last night has nothing to do with where the domain resides. If you're going to be running a software company, that statement is actually a little worrisome…

Let get everything settled with the partnership, end this amicably, and then we'll take care of all the transfers. We have no issues with you, and we honestly wish Fishbowl all the success in the world! In fact, when this is all done and Fishbowl 2.0 is released, we'd still be happy to email all our users and promote the app for you. We have no ill will here. We just don't have time to commit to the project and want to exit.

We can set up an escrow so there are no issues with trust etc. We have much bigger things to worry about than stealing, or holding hostage, a domain name…


Cheers,
Jay Myers
Bold Co-Founder
@bold_commerce | boldcommerce.com | Who we are!

Join our team, **we're hiring!**  https://www.youtube.com/watch?v=ECzYcz1ArUA



On Wed, Mar 16, 2016 at 4:24 PM, Dean Zelinsky <dean@deanzelinsky.com> wrote:
Hello Jay -

Thanks for getting back to me and making it clear that you are holding the domain hostage.
I have engaged the lawyer on behalf of the company so please know that the meter is now running.

As you know, we are getting negative reviews on Shopify, we just received another last night, and this is damaging the company.
I cannot get things repaired on the platform without adding resources and your refusal to make this domain transfer is clearly complicating matters.

If you want to have a meeting to attempt to rectify things, I would suggest sooner rather than later.

Take care,
Dean

> On 16, 2016, at 2:21 PM, Jay Myers <jay@boldcommerce.com> wrote:
>
> I apologize for that, I'm literally in meetings 9 hours a day… I'll schedule a call for tomorrow or Friday morning. I'd like to get everything all settled with the partnership before we do anything with the domain.
>
> Let me know your thoughts on that, the buy out,  and how you'd like to proceed and we'll get that all wrapped up.
>
> Cheers,
> Jay Myers
> Bold Co-Founder
> @bold_commerce | boldcommerce.com | Who we are!
>
> Join our team, **we're hiring!**  https://www.youtube.com/watch?v=ECzYcz1ArUA
>
> On Wed, Mar 16, 2016 at 2:02 PM, Dean Zelinsky <dean@deanzelinsky.com> wrote:
> Hello Jay -
>
> It only got on my radar that the domain name was registered to you recently when we were dealing with the server issue.
>
> What's making this urgent is the fact that you have not responded to my email, nor picked up any of my numerous phone calls, or returned any of my phone calls or respond to any texts for over a week now.
>
> Note that India promptly transferred their IP when I asked them to.
>
> Let me turn your question around…since this is a simple administrative 5 minute thing to do, what is causing the delay?
>
> Dean
>
>> On Mar 16, 2016, at 1:11 PM, Jay Myers <jay@boldcommerce.com> wrote:
>>
>> Hey Dean,
>>
>> Sorry for delay in getting back to you, I've been meaning to followup on this. Is there particular reason you're interested in transferring the domain so urgently? Seems odd that this is such a panic now, but hasn't been for 9 months.
>>
>> Cheers,
>> Jay Myers
>> Bold Co-Founder
>> @bold_commerce | boldcommerce.com | Who we are!
>>
>> Join our team, **we're hiring!**  https://www.youtube.com/watch?v=ECzYcz1ArUA
>>
>> On Mon, Mar 14, 2016 at 9:30 AM, Dean Zelinsky <dean@deanzelinsky.com> wrote:
>> Hello Jay -
>>
>> Thanks for getting back to us.  Sorry the partnership is not working out for you guys and we certainly can discuss this.
>>
>> Right now, we need to get the domain into the business account as all IP is supposed to reside within Fishbowl Prizes, Inc.
>>
>> I sent you the Fishbowl Godaddy account info last week and have attached a screen shot with the account info here.
>>
>> I will initiate a transfer from Godaddy this morning and please see that it is followed thru on your end.
>>
>> Thanks,
>>
>> Dean
>>
>> <Screen Shot 2016-03-13 at 4.13.35 PM.png>
>>
>>> On Mar 11, 2016, at 7:22 PM, Jay Myers <jay@boldcommerce.com> wrote:
>>>
>>> Hey Dean and JRK,
>>>
>>> I apologize for the slow responses lately. We've got a lot on the go, and my time has been getting spread thinner and thinner…
>>>
>>> We had a meeting yesterday to discuss the bigger picture of our involvement in the project. The issue we're having on our side is that we have so many projects on the go. With us only owning a third of Fishbowl it's hard for us to justify resources to it, against products we own 100%.
>>>
>>> This form of a partnership has been a learning experience for us.

We decided yesterday that it's to hard for us to continue this way. The idea of Fishbowl is good, it's just the structure of the partnership is hard for us. The distance, the timezones. It makes more sense to focus on products we're building internally.

So what it comes down to for us is we're ideally looking to exit. It's not fair to you guys that we don't fully commit. We've spent over $140K in salaries, servers, and other costs to this point.

Based off the current revenue, not even counting what we've put in, we'd settle with $100K for our shares and be on our way.

It's been great working with you guys, this is strictly a business decision. With where our company is going, this just doesn't fit into the picture anymore. Let me know how you'd like to proceed.

Cheers,
Jay Myers
Bold Co-Founder

@bold_commerce | boldcommerce.com | Who we are!

Join our team, **we're hiring!** https://www.youtube.com/watch?v=ECzYcz1ArUA

EXHIBIT G

**Yesterday** 11:01 AM

Acct: 124395777

FishDaddy2016!

Thanks for handling today...

**Yesterday** 3:00 PM

Jay...is this being handled?

**Yesterday** 4:44 PM

Jay...you said this will be handled today. I explained to you this morning the issues it is causing me.

**Today** 8:53 AM

Today 8:53 AM



Got the messages. I'll be on it. I'm away all weekend and traveling next week. I'll get to it as soon as possible.

Not clear what you are saying. When will this be handled?

I'm back in town on the 30th. So for sure by then. I'll try to do it from a hotel prior though of possible. There's a lot more to it than just transferring it. If I just do that and Fishbowl goes down because it doesn't propagate properly it would be disastrous to the app. Your urgency and reckless attitude is a little worrisome to be honest.

Maybe it's best we get things settled with the partnership first. If you're willing to risk the app going down and rush things like this, I'm concerned about what could happen to Fishbowl in general.... If not, I'll get to it

I'm trying to do this in the best way possible. Your attitude here is demonstrating you clearly don't have the best interest of the company in mind and you have a personal agenda. I have screenshots of all this. I'll do it as soon as I can. I won't be at a computer today. So I can tell you that's not possible. You're being wreckless. You need to relax

i don't appreciate your personal insults. It's company property and you are refusing to move it over to the company where it belongs. And that is the REAL concern.

Once again, JRK turned over the ip...you guys are dodging and weaving for 2 weeks now.

Your excuses why it can't be done is just your way of hanging onto the ip that belongs to the company. And your attempts at blame shifting that somehow I am not concerned about the company is off the charts ridiculous.

I have top tech/developer/ security specialist in place that will handle the transfer and make sure it all goes smoothly.

So Monday , if it is not done...I hire the attorney. And once again I will remind you, in ip cases, the prevailing party gets their legal fees paid.

This can be done the easy way or the hard way but it will get done.

Once again...your choice.

**Today** 12:01 PM

Do you have the DNS
settings and namesevers
needed to make sure the url
works when transferred. Do
you have the subdomains set
up for the various apps.
Specifically the Shopify one.
If I switch it now and that's
not set up it all goes down. Is
that ready at this second?

This has nothing to do we a
personal arrack. I don't think
you've given any thought to
all this. If you haven't, then it
again shows you are not fit to
run it. Is all that set up, and/
or ready?



Messages (36)  **Jay Myers**          Details

If not, we can't transfer it, it
will brake it . And if not, it
shows your motives are of
personal interests and not
the best interest of Fiahbowl.

Before I transfer anything I'm
having our lawyers review
everything. Your actions here
are extremely concerning.

Please tell me what all the
steps are you've taken to
prepare for the transfer.

●●○○○ AT&T LTE          7:58 PM          38% ■
Touch to return to call 05:10

Messages (36)  **Jay Myers**          Details

Once again, please try to keep this professional. No need for personal attacks.

I have Peter here ready and I can connect him with you to make the transfer. We are not changing the name servers.

Peter will handle so let me know when you need to connect with him.

And yes I have given this all a lot of thought and that is why I put Peter in place.

Please tell me what all the steps are you've taken to prepare for the transfer.

What are the nameservers? I need to have some level of confidence. Can you list them, can you tell me all the steps you took? I'm not making it personal. It's a simple question.

Saying "I have Peter" means nothing. I don't know who Peter is. I just need confirmation everything is prepared.

Jay ... For the last time, I am not doing this personally...I have put Peter in place to handle. When you tell me you are going to make the transfer, I'll connect you.

For that matter, I gave you the login yesterday...you guys can do it yourselves.

If you are not going to make the transfer, simply stop texting with the hurdles and other insanity.

Delivered

Delivered

The last time you asked us to transfer it we didn't have access and I never heard of Peter. You're saying this all now because I brought up the concerns... We'll deal with it like I said. And we'll don't when we can to make sure it doesn't go down. Back to the original text message I sent you this morning.

It will be done when our guys can make sure it's done right. I've documented his whole conversation and its

whole conversation and its proved the complete lack of thought you've put into this transfer. I'm gone for a week and we'll get to it when I feel it can be done properly. This conversation has proven that I can't leave it in your hands while I'm away.

●●●●○ AT&T LTE     3:10 PM     ⚹ 57% ▮▯

Messages (28)    **Jay Myers**     Details

I can't leave it in your hands while I'm away.

Peter is perfectly capable. I would be happy to put you in touch with him.

This conversation only proves you are unwilling to transfer the ip the company owns.

I will engage the lawyer Monday as I stated earlier. Unless you are willing to transfer on your own, or you want to connect with Peter to make the transfer...I would prefer to end this conversation here.

Delivered

Yesterday your exact words to me were "All you have to do is click the link to transfer it". Do you still agree with that statement?

EXHIBIT B

# *Law Offices of Bradley Block*

March 21, 2016

VIA EMAIL (jay@boldapps.net)

Mr. Jason Myers
Bold Labs, Inc.
50 Fultz Blvd.
Winnipeg, MB RY3 0L6, Canada

      Re:    Fishbowl Prizes, Inc.

Dear Mr. Myers:

Fishbowl Prizes, Inc. ("Fishbowl") has retained me to represent it in its disputes with Bold Commerce, among other matters.

I have spoken with Dean Zelinsky and reviewed your recent emails and text message exchanges with him. There is no need for me to review the background of the disputes—you know it.

Reference is made to the Fishbowl Prizes, Inc. Shareholders Agreement dated October 30, 2015 (the "Shareholders Agreement"). Bold Labs, Inc. ("Bold") is in breach of the Shareholders Agreement in the following ways, among others:

1. Section 5.1 requires each shareholder to contribute to Fishbowl "all intellectual property reasonably necessary in furtherance of the Business." Bold has refused to turn over intellectual property including, without limitation, the domain name and control of the efishbowl Amazon AWS account. Fishbowl demands that Bold immediately comply with these obligations.

2. Section 5.2 requires Bold to perform certain services for Fishbowl. Bold has stated that it will stop performing those services and in fact has stopped performing them. We anticipate discussing this breach, and Bold's desire to have Fishbowl purchase its equity interest in Fishbowl, at a later time.

In addition, Fishbowl hereby demands that Bold immediately turn over access and control of all other Fishbowl intellectual property in Bold's possession and control, including but not limited to control of accounts for Shopify, Mandril, Mail Chimp, Facebook and Twitter.

**If Bold refuses to comply with this demand by the close of business tomorrow (Tuesday, March 22, 2016), I will prepare the appropriate papers to commence litigation.**

LAW OFFICES OF BRADLEY BLOCK

Mr. Jason Myers
March 21, 2016
Page 2

Compliance with this demand requires Bold to do the following, at a minimum:

A. <u>Domain Name</u>. Mr. Zelinsky has already completed the steps to initial the transfer of the domain name into a GoDaddy account; Bold just needs to accept the transfer request.

    (1) As an excuse for delaying transfer of the domain name, you raised questions over the weekend about whether Fishbowl has the DNS settings and the nameservers to operate after you transfer the domain name. As you know, the nameserver information is publicly available, and all of this information is also contained in the Amazon AWS account discussed below. This is not a valid excuse for delaying the transfer of the domain name.

B. <u>efishbowl Amazon AWS Account</u>. Fishbowl needs (a) credentials (such as login information and possibly electronic certificates) for full, unrestricted access and administrative control over this account, and (b) access to the fishbowlprizes.com DNS zone file.

    (1) Bold had previously given Fishbowl credentials to allow Fishbowl limited access to the Amazon AWS account. Those credentials no longer work. **Blocking this access was a step backwards and provocative**.

    (2) Bold previously requested that Fishbowl take over financial responsibility for this account, and Fishbowl agreed. Fishbowl will change the billing information once it has access to the account.

C. <u>Other IP (including but not limited to Shopify, Mandrill, MailChimp, Facebook, Twitter, Weebly, Magento and Big Commerce)</u>. Fishbowl needs (a) credentials for full access and administrative control over the Google Apps for Business account used for fishbowlprizes.com, and (b) credentials for full access and administrative control of other applications, webservers, databases, applications servers and other systems and servers related to fishbowlprizes.com, including but not limited to Shopify, Mandrill, MailChimp, Facebook, Twitter, (and if necessary) Weebly, Magento and Big Commerce.

Because Fishbowl does not have access to these accounts at this time, it is possible that it will learn that additional steps are also required once access is given.

None of these tasks are complex or technically challenging. It will take less than an hour for a knowledgeable person to provide the credentials to accept the transfer of the domain name and provide the credentials to Fishbowl.

Mr. Jason Myers
March 21, 2016
Page 3

Mr. Zelinsky has been asking you to transfer the domain name and control over the Amazon AWS account for two weeks. You initially ignored him. Then you demanded a $100,000 for Bold's equity in Fishbowl as a condition of discussing these issues. Finally, in your conversation with Mr. Zelinsky on Friday, you promised to make the transfers that day; you then failed to do so. Over the weekend, you again demanded an agreement to buy out your equity as a condition of transferring this IP, and also raised new (and spurious) questions about information regarding the nameservers, the DNS settings and apps (all of which is in Bold's possession and therefore could be immediately turned over, as described above). You then indicated that needed additional time because you were travelling out of town—even though others at your company could and would actually handle the transfer with a nominal time commitment.

None of these excuses are reasonable, and Bold needs no more time to comply with this demand. Further, based on your conduct, blocking of access to the Amazon AWS server and ever-changing demands and reasons for failing to perform as required, Mr. Zelinsky no longer believes that you will in fact act if given more time. Bold must immediately comply with its legal obligations or litigation will ensue.

Sincerely,

Bradley S. Block

cc:     Mr. Dean Zelinsky (via email)

EXHIBIT I

## iMessage
**Today** 4:17 PM

pdf

16-3-21 Myers Letter....

Jay...this is from Brad Block, he is copied in here. Am texting over because he received an out of office reply to the email.

Jay Myers

As I mentioned. I'm out of town <u>until the 29th.</u> If we do it while we are not around to monitor it could go down. Maybe you don't care enough to make sure h site remains up, but I do. I want to make sure it's done properly. You're wasting your money on lawyer fees. It will get done properly when we can monitor the transfer.



This letter is somewhat of a joke. There is a direct correlation of when you started managing support to when the app stopped growing revenue. It has grown every month until you took over. We have very good reason to be concerned about letting you manage it. You have no experience is this and you've demonstrated that over and over. We're not trying to delay, we just want to make sure it's done properly.

We have never once led you to believe otherwise. If something goes wrong with it, it's 33% our company too. We can't let you, he only partner with zero technical experience make these decisions. You're wreckless and you've proven that in the last 30 days. The app revenues are a testimony to that as well.



Today 9:24 PM

Mr. Myers--We will attempt to ignore the personal insults. Your goal over the last few weeks has been to hold the domain name and other IP hostage to extort a buyout payment, and this communication seeks to accomplish the same goal. Your excuses, however, have no merit. You are not personally necessary to accomplish this transfer, which is mostly administrative. Your supposed concerns about the transfer are disingenuous--if you really doubted our ability to

manage the technology, you would have had your tech people contact Peter Mondlock as Dean offered; they could verify his bona fides as they were making the transfers and providing the credentials. If you cared about the future of the company, as opposed to trying to maximize your buyout payment, you would not have quit providing the services required under the shareholders' agreement.

Ultimately, though, your personal goals are not relevant. Dean is the

President of the company, and this is his decision to make. You cannot refuse to perform under the contract because you supposedly disagree. Further, given your past conduct, we do not believe you will turn over the IP if we give you more time-- you either will turn it over tomorrow or you don't plan to ever turn it over voluntarily.

If you do not turn over the IP by the close of business tomorrow, we will commence litigation. We are not going to further debate the issue.



Jay Myers

It will be done on the 29th, no earlier. Feel free to waste your time. I've been trying to help. This is turning into a joke. Everyone that would be part of this is on the same trip as I am. There is no one at the office to monitor it. It's become evident that we can't leave it in Dean's hands.

I'm not trying to extort a buyout payment. In fact, I really don't care about that. I care only about making is transfer smooth. Dean has yet to provide Peter's

contact info. So even if we wanted to contact him we couldn't.

His original comment on Friday was "all you have to do is click the link to transfer it". If i had done at on Friday, the Fishbowl website would have gone done. Dean does not have the best interest of the integrity of the company in mind.

It will be done when we are all back and our lawyers are finished reviewing everything.

It's your choice to waste your time in the next 8 days or